Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THELTON E. HENDERSON

IN RE:                                  )
BANK OF AMERICA CREDIT PROTECTION  ) NO. 11 MDL 2269 TEH
MARKETING AND SALES                ) Monday
LITIGATION.                        ) January 14, 2013
_____) 10:00 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          LIEFF, CABRASER, HEIMANN &
                             BERNSTEIN
                             250 Hudson Street
                             8th Floor
                             New York, New York 10013
                     BY:   **RACHEL GEMAN, ESQ.**


                             LIEFF, CABRASER, HEIMANN &
                             BERNSTEIN
                             275 Battery Street, 30th Fl.
                             San Francisco, California  94111
                     BY:   **DANIEL HUTCHINSON, ESQ.**


                             GLANCY BINKOW & GOLDBERG, LLP
                             1925 Century Park East
                             Suite 2100
                             Los Angeles, California 90067
                     BY:   **MARC GODINO, ESQ.**


                             CAREY DANIS & LWE
                             8235 Forsyth Boulevard
                             Suite 1100
                             St. Louis, Missouri 63105
                     BY:   **FRANCIS FLYNN, ESQ.**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  Official Reporter - US District Court
                  Computerized Transcription By Eclipse

1   **APPEARANCES:  (CONTINUED)**

2

    **For Defendants:**          GOODWIN PROCTER, LLP
3                                901 New York Avenue, N.W.
                                 Washington, DC 20001
4                        BY:   **DAVID PERMUT, ESQ.**
                               **KATHRYN LAZAREV, ESQ.**
5

6                                GOODWIN PROCTER, LLP
                                 Three Embarcadero Center
7                                24th Floor
                                 San Francisco, California 94111
8                        BY:   **PATRICK THOMPSON, ESQ.**
                               **HONG-AN VU, ESQ.**
9

10                                   _ _ _

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2   JANUARY 14, 2013                            10:10 A.M.
 3
 4        THE CLERK:  Calling MDL Case 11-2269, Bank of America
 5   Credit Protection Marketing and Sales Practices Litigation.
 6        Counsel, please come forward to the microphone and state
 7   your appearance for the record.
 8        MS. GEMAN:  Good morning, your Honor.  Rachel Geman,
 9   Lieff, Cabraser for the class.
10        MR. GODINO:  Good morning, your Honor.  Marc Godino
11   from Glancy, Binkow and Goldberg on behalf of the plaintiffs.
12        MR. HUTCHINSON:  Good morning, your Honor.  Daniel
13   Hutchinson also of Lieff Cabraser and also for the class.
14        MR. FLYNN:  Francis Flynn, Carey, Danis and Lowe,
15   also for the class.
16        THE COURT:  Okay.
17        MRL PERMUT:  Good morning, your Honor.  David Permut
18   from Goodman Procter for defendants.
19        MR. THOMPSON:  Good morning, your Honor.  Patrick
20   Thompson, also from Goodwin Procter for defendants.
21        MS. LAZAREV:  Good morning, your Honor.  Kathryn
22   Lazarev for the defendants.
23        MS. VU:  Good morning, your Honor.  Hong-An Vu for
24   defendants.
25        THE COURT:  Okay.  Good morning to all of you.  As
```

1  you know, we're here to consider plaintiff's motion for final

2  approvals of the class action settlement, as well as their

3  motion for an award of attorney's fees and costs to class

4  counsel and service awards to the class representatives.

5       I granted preliminary approval of a settlement and

6  certified a settlement class on July 23rd of last year.

7       Let's begin by -- I'm inviting you to speak to the

8  questions that are in the list that Ms. Ingle has distributed

9  to you.

10      Can we begin with that?

11          MS. GEMAN:  As you like, your Honor.  Would you

12  prefer me to address (indicating)?

13          THE COURT:  Yes, please.

14          MS. GEMAN:  And, your Honor, as always, we appreciate

15  the guidance of your questions to help focus our presentation

16  and not waste the Court's time.

17      The settlement is fair, reasonable and adequate.  One

18  objector, as you note, states that she paid 5500 and change,

19  5558.27.  The question is why is $50 a fair and reasonable

20  recovery for her and others like her?

21      There is a number of answers to that question, your Honor.

22  The first is, of course, she was given full notice of what the

23  estimated recoveries were and what class counsels and others

24  view as the strengths and weaknesses of the case.  If she

25  believes that she could do better in an individual case -- this

1  is obviously a Rule 23(b)(3) settlement -- she could opt out.

2  And the recent Ninth Circuit case of *Lane versus FaceBook* cited

3  in the parties' papers from September of 2012 makes that very

4  point.  That's a bit of a procedural answer.

5       I also want to offer some substantive responses to

6  underscore the point that the process to reach this result was

7  fair, adequate and negotiated at arm's length.

8       Settlement is the product of compromise.  It's such an

9  obvious point that sometimes it can go unnoticed, but the Ninth

10  Circuit has been clear in cases such as *Hanlon v Chrysler* that

11  a settlement can be prettier, snazzier, but the issues are:  Is

12  it a fair outcome?

13       So this is assuming that she would get what she would get

14  on her best day at trial, and after appeals, possibly years and

15  years from now.

16       The reality, of course, is that based on the opinion of

17  informed counsel and with the aid of an experienced -- very

18  experienced mediator, there were legitimate risks in the case.

19  There were risks at certification.  There were risks on the

20  merits.

21       The Court is intimately familiar with the procedural

22  history of the case and so your Honor has had the chance to

23  adjudicate some of the issues, but not, of course, all of the

24  risks that would come up because -- you know, because there was

25  a range of risks that we discussed.  And, again, so that's

1   speaking generally about some of the risks.

2       I want to speak in particular about some of the risks that

3   her particular case might have, assuming that her estimate of

4   what she paid is correct.

5       In coming to the agreement as to the overall number on the

6   one hand and beyond that the specific allocation, the parties

7   considered and disputed and fought over, but ultimately

8   resolved a number issues.  And one of the issues relates to,

9   you know, what are some the risks of somebody proving a

10  slamming claim --

11              **THE COURT:**  I'm sorry.  What are the risks of --

12              **MS. GEMAN:**  What are some of the risks for somebody

13  in certifying and proving a claim that they were enrolled

14  involuntarily.  And part of that -- and the data produced in

15  connection with the mediation shows generally most people,

16  large numbers of people only have the product for four or five

17  months.  About half the people who sign up only have the

18  product for about a year.  Obviously, there are others who have

19  the product for a very long time.

20      The risk for somebody to prove that they were enrolled

21  without their consent and to have a continuing violation from

22  that initial unconsented-to enrollment realistically lessens

23  over time.

24      Somebody realistically -- and this, of course, was the

25  allegation we brought and we believe it.  Somebody may well not

1   notice of charge of $17 or $20 over a few months, but if

2   somebody has a charge for years and years and years equaling

3   thousands of dollars, defendants -- we know for a fact that

4   defendants would argue you knew this.  You -- you know,

5   essentially you -- this is something that you would like.

6        In addition, there are -- the parties disputed, and this

7   came up in our discussions about the meet-and-confer over

8   discovery about what -- you know, can we prove from the records

9   every single person who was enrolled without consent, and the

10  answer regrettably is probably not.

11       And so this person would have to, you know, prove that she

12  was, in fact, enrolled without consent and then there would be

13  the question of, well, for how long should she recover even

14  assuming that she makes that proof.

15       Now, this is obviously much more detailed than people

16  usually discuss in a settlement hearing because you're looking

17  broadly and appropriately at issues of essentially rough

18  justice and fundamental fairness, but I think these details

19  underscore the points to illustrate that there, on the one

20  hand, were significant risks and, on the other hand, that

21  counsel appropriately factored in those risks in coming up with

22  an answer.

23       And so if somebody gets paid $50 or even less, you know,

24  if that represents a few months of payment in a case where they

25  arguably were enrolled without their consent, we believe that

```
1    is a fair outcome.

2         I would also note, your Honor, that this is --

3              THE COURT:  Let me interrupt you.

4              MS. GEMAN:  Yes.

5              THE COURT:  Beyond an interrogatory perhaps that

6    says:  Give us all deductions back to such-and-such a date for

7    claimant Jane Doe, what's involved in finding out whether this

8    $5,500 has, in fact, been taken?

9              MS. GEMAN:  To find out whether this objector paid

10   5,558.27 is an easy matter based on the records.  Your Honor is

11   absolutely correct.  One simply has to look at Bank of

12   America's records --

13             THE COURT:  So then my concern is:  Why can't you

14   fashion something for people like this so that instead of

15   getting 50 or 100, she gets something more commensurate?

16   What's the problem with that?  That's my real question.

17             MS. GEMAN:  Right, right.  Okay.  I understand.

18        Well, your Honor, I think there's two answers to that

19   question.  If your Honor's question is really assuming that

20   victims of the alleged scheme to enroll people without consent

21   paid varying amounts -- right?  Some people may have only paid

22   10 bucks, some people much more than that -- your question is

23   rather than having a settlement that allocated those payments

24   essentially equally to different people, why wasn't there a

25   much more complicated algorithm that would have given people a
```

1  pro rata share of what they paid.

2      And think there are -- do I understand your Honor's

3  question correctly?

4          THE COURT:  Yes.

5          MS. GEMAN:  Okay.

6          THE COURT:  And I'm not talking about exact amount to

7  all of these millions of people --

8          MS. GEMAN:  I understand.

9          THE COURT:  (Continuing) -- but something that is

10  individually fair rather than globally fair.

11      Maybe it's a dumb question --

12          MS. GEMAN:  No, no, no.

13          THE COURT:  (Continuing) -- but that's my question.

14          MS. GEMAN:  Your Honor, I do employment cases and

15  frequently those cases you look at hours, you know, weeks

16  worked, and this is something that we considered here.

17      I do think though, your Honor, that this is individually

18  fair for some of the reasons I said, which is even assuming

19  that you can prove that someone was enrolled without their

20  consent and then the issue is simply damages, it's not such a

21  simple answer.  Because unlike in a wage case where, for

22  example, every hour of unpaid work you get back.  Here there

23  are specific defenses that are only implicated as time passes.

24      If I -- you know, if I don't notice 20 bucks for a month,

25  you know -- not to be colloquial, but respectfully if I don't

1  notice 20 bucks for a few months, as a plaintiff's lawyer I

2  believe that's a very, very strong claim.  That is a scheme.

3       I know for a fact that defendants would say as one year or

4  two years goes by, even they might say, you know, four or five

5  months, at some point you notice this and if you want to be in

6  the program, then your remedies from the initial unconsented-to

7  enrollment in the program are limited.

8       So this is very, very different from a simple case where,

9  you know, somebody works for a month and has unpaid overtime

10 versus someone who works for four years and has unpaid

11 overtime.

12      And to be clear, the law -- you know, everything a

13 trade-off, which is why you look at the overall fairness and

14 reasonableness of the settlement.  We could have made a very

15 complicated claim form that probably would have been at the

16 result of some people claiming; that probably would have been

17 at the expense of the clearness and simplicity.  And there

18 would be an argument there that that didn't adequately factor

19 in the risk, precisely because it treated someone who was in

20 the product for two years the same as someone who was in the

21 product for a few months.

22      So taking all that together and based on the clear Ninth

23 Circuit authority that someone with a very large claim can opt

24 out.

25      That's precisely the point of Rule 23(b).  You don't need

1   all class members to suffer the same exact amount of damages.

2   And you don't need a settlement to even -- you know, settlement

3   notice doesn't even have to say to the class this is how much

4   you might recover.

5        You know, in financial fraud cases you just might have a

6   complicated algorithm and that's enough for people.  Here we

7   tried to go above and beyond to do our part, level best to

8   estimate working based on previously approved settlements the

9   law governing allocation and other factors.

10       And so, your Honor, all this to say, I strongly submit

11  that $50 is a fair and reasonable recovery.

12       Even in the securities context where it's somewhat easy to

13  look at per share loss and so you can -- and so you have a lot

14  of case law in the securities or financial fraud context that

15  says:  This recovery represents X percent of losses.

16       Generally we don't -- you know, isn't expected in consumer

17  cases for precisely these sorts of reasons.  But even in that

18  inapposite context -- and we've cited some of these cases, I

19  believe *Mego* is one of them -- it's clear that under the

20  circumstances 10 percent may well be a very fair recovery, or

21  even lower.

22       And so, you know, here you have under this scenario which

23  I think is an unusual outlier, you have less than that; but for

24  most folks if you're paying, you know, a couple hundred

25  dollars, then this is absolutely fair.

1    So I think the fairness of the notice, the fairness of the

2  process, the fairness of factoring in the risks that someone

3  like this -- that I respectfully submit this plaintiff or this

4  objector would have in litigating, as well as the benefits of

5  having this resolved now versus years from now, you know,

6  strongly underscore that this is a fair amount.

7    And if your Honor likes, and I think this segues somewhat

8  into the next question, we can discuss the allocation a little

9  bit.  And this was a point your Honor raised at preliminary

10 approval as well.

11   And so the question here is:  How did we arrive at the

12 estimate of $50 and $100 as the payments amounts?  And we

13 started with sort of two background buckets.

14   One was the basic law of allocation that permits different

15 class members to be treated differently within a settlement so

16 long as allocations, very broadly speaking, satisfy the same

17 standard as the settlement as a whole.  Is the allocation fair?

18 Is it reasonable?  Is it adequate?  And you factor in the

19 strength of claims in that analysis.

20   We also looked at what courts had proved upon search and

21 review in other similar settlements of payment protection

22 cases.  One overall theme here is that we are quite experienced

23 in litigating and settling these cases and in examining the

24 data that enables us to do so, as well as understanding the

25 contours of the legal risks.

1       So we had as data points other -- the most on-point data

2    points in other similar litigation were these other recently

3    settled payment protection cases.  We had the basic law of

4    allocation.  We had the happy fact, you know, based on

5    plaintiff's vigorous litigation and mediation, that we had

6    generally more money per class member available than in some of

7    these other cases.

8       And we also in good faith wanted to learn as we went.  We

9    wanted to up the claims rates from some of these other

10   settlements.  We wanted to look at how the numbers would look

11   under certain foreseeable claims rates if we made the minimums

12   higher.

13      In some of those other settlements that the Court's have

14   approved, people could get as few as $15 if they were

15   dissatisfied with the product, and then as much as about 60

16   they could put in for if they could state that they believe

17   they were improperly denied a claim.

18      We wanted to give -- you know, we wanted to sort of

19   motivate people to get the money.  We wanted to simplify the

20   claim form, so we created these two categories.  And we believe

21   that the basic ratio of one-to-two is fair, reasonable and

22   adequate.  And what I mean by that is, the ratio of what

23   somebody who was -- who states that they believe they were

24   improperly denied a benefit, if they actually applied versus

25   the other category, which is people who say that they were

1  improperly enrolled or people who believe they were enrolled --

2  you know, who believe their product was not as advertised.

3      And if you look at a ratio, there's two questions:  Why

4  isn't the ratio bigger?  Why isn't the ratio smaller?

5      Why isn't the ratio bigger?  Why isn't it that the

6  claim-denied people got 150; or, conversely, why weren't the

7  numbers 125, something like that.  And against -- against the

8  backdrop, a very kind of rough justice is entirely appropriate.

9      We did not think a more pronounced split between those two

10 groups warranting a bigger ratio, like one-to-three was

11 appropriate.  Why?  Because some of the same issues permeate

12 across the two different groups.  If somebody -- many, many

13 more people than who were denied benefits suffered presumably

14 triggering events, but we believe a lot of folks may have been

15 implicitly deterred or they may have realized that they weren't

16 eligible for coverage.

17     In addition, we respectfully submit that the

18 benefits-denied group faced some risks in proving their claims

19 that perhaps are not applicable to the other groups.

20     So factoring in what other courts have, you know, approved

21 as fair, reasonable and adequate, the law of allocation, the

22 particular issues and risks, we came to this ratio of

23 one-to-two and as applied specifically the numbers of 50 or 100

24 based on our best efforts, which is estimating claims rates and

25 keeping in mind our interest in a fulsome notice program.

1      And, again, I don't know if that answers your Honor's

2   question, but that speaks to the ratio and the absolute

3   amounts.

4           **THE COURT:**  Okay.

5           **MS. GEMAN:**  And if I could, your Honor, at the risk

6   of stepping away from the specific into the general, these -- I

7   think this analysis underscores that we have satisfied, more

8   than adequately satisfied the factors that Courts look at in

9   this District and in this Court to look at the fairness of a

10  settlement.

11      We worked carefully with an experienced negotiator, a

12  mediator.  We ultimately resolved only after a mediator's

13  proposal.  You know, these numbers didn't come out of nowhere.

14  They came out of a careful and informed and lengthy process.

15  We were very well equipped to understand the risks of the case,

16  having gone through multiple rounds of motions to dismiss.

17      Your Honor might recall that there were eight underlying

18  lawsuits that were being litigated, in various stages of

19  litigation.  In order for the lawsuit to proceed efficiently,

20  certain of the plaintiffs moved for coordination before the

21  MDL.

22      Defendants opposed that motion, but we felt strongly that

23  that would ensure the efficient litigation here.  That's how we

24  came to your Honor.  And then we had more, additional motion

25  practice and then a settlement process.

1          And so that is the process that resulted in this outcome.

2     These -- this is similar to, but in some ways slightly more

3     robust, than settlements in similar payment protection cases.

4          And I think I wanted to make another point as well before

5     turning to the next question, which is, right now we're

6     talking, which is appropriate, about the four corners of the

7     common fund that was created for the class; the $20 million

8     common fund.  I do want to stress that, as your Honor is aware,

9     the benefits of the settlement are -- go beyond the common

10    fund, although that's obviously the primary benefit.  We have

11    certain practice changes and certain numbers of months at no

12    cost.

13         Now, we have this somewhat unique situation in this case

14    where the defendants are winding down their product.  And so,

15    you know, that's essentially in the mix as well, but we were

16    able to enhance the procedures associated with the wind-down

17    for the benefit of the class.

18         And this will segue into question three.  One of the

19    issues in looking at the -- going from the gross settlement

20    amount to the individual recoveries was, you know, factoring in

21    what gets taken away from the common fund, and these are the

22    standard issues.  There are attorney's fees, for example, and

23    there's administration.

24         One thing we were pleased to be able to negotiate with

25    respect to notice and administration is that the defendants

1   internalized some of that cost, which ultimately results in

2   more money for the class.  Specifically, as your Honor is

3   aware, the defendants undertook the mailed notice to then

4   current cardholders.

5        Our claims administrator, Gilardi, undertook notice to the

6   former cardholders, and that's laid out in the declarations of

7   Ms. Beck and Mr. Sherwin.  And so that was in the mix as well.

8        In terms of looking at the estimated costs of settlement

9   administration, one point I wanted to underscore is that -- I'm

10  not counting what defendants are doing.  We did a competitive

11  bidding process and I can represent to your Honor that based on

12  the estimated claims rate that we hoped to get, they have

13  estimated in the --

14            **THE COURT:**  What is the estimated claims rate?

15            **MS. GEMAN:**  We're estimating maybe three or

16  four percent.  And that's -- it sounds like a small number, but

17  I'm sure your Honor is familiar with the reality of consumer

18  settlements, and this is substantially higher than in some of

19  the other cases that have been approved.

20       And keep in mind, your Honor, that we need a claims

21  process here because the records do not on their face

22  demonstrate who was involuntarily enrolled.  The records do not

23  demonstrate who was deceptively enrolled.  The records on their

24  face do not demonstrate -- they demonstrate who was denied for

25  benefits, but they don't answer our liability question of

1    answering.

2         And so in addition to raising somewhat of an

3    ascertainability risk, it necessitated, in the interests of

4    fairness, a class member representing that they were, for

5    example, involuntarily enrolled, as opposed to us using records

6    that wouldn't say versus one or the other.

7         And so -- and, you know, we've asked for an updated

8    figure, but our estimate -- and the answer will depend, of

9    course, on the number of claims filed and the number of class

10   member interaction that the claims administrator deals with.

11   You have folks writing to them and talking to them and asking

12   them questions and so forth.  But in the interests of being

13   very, very conservative, I think it could be as much as

14   $3 million, but we hope that it will be as -- you know,

15   significantly hundreds of thousands less.  And we have a call

16   out to the claims administrator right now.

17        And so, your Honor, our submission is that.  And,

18   obviously, you'll hear from the defendant as well and one of

19   the objectors is hear as well.  I'd like to reserve my right to

20   respond to any specific points, but I think that discussing on

21   these small, very detailed issues -- they are not small issues,

22   but these discrete issues within the overall analysis is a

23   window into the process, highlights some of the strengths of

24   the case, highlights some of the significant risks of the case,

25   highlights our experience and thinking through these issues and

```
1    our dedication to doing them fairly and in good faith, and
2    underscores why we respectfully submit that the settlement
3    should be approved and that our fee petition should be granted.
4              THE COURT:  Okay.
5              MS. GEMAN:  Does your Honor have additional questions
6    that arose out of the ones you have already asked?
7              THE COURT:  Not at this time, counsel.
8              MS. GEMAN:  Thank you.
9              THE COURT:  Do you wish to add to this, counsel?
10             MR. PERMUT:  I will be very brief, your Honor, but if
11   you have any questions, any additional questions, feel free to
12   ask any time.
13        Your Honor, I think that we put in our papers why we
14   believe that the settlement is fair, adequate and reasonable
15   and we gave you some information about the legal defenses that
16   we believe we could have asserted and the difficulties the
17   plaintiffs would have had and why this is a compromise.
18        I'm not going to repeat anything there, but what I want to
19   do, I did want to address your first question, which is the
20   fairness of the $50 amount and why we strongly believe that
21   that's a fair amount for the customer.
22        In particular, with respect to this objector, the choice
23   isn't between $50 and $5500.  The choice is between the
24   opportunity to participate in a settlement in which he'll
25   receive $50, have to hire no additional legal talent and offer
```

1   no proof in order to get the benefit.

2        In the alternative, there would be an individual claim.

3   You can opt out of the settlement and bring an individual claim

4   if you think the $50 doesn't satisfy you and then we would get

5   into individual litigation.

6        In particular, with respect to this one objector, you

7   know, we believe that we keep evidence and that there are call

8   -- or, records that would contradict a little bit of what was

9   said in there about the knowledge regarding the product and

10  inquires regarding the product.

11       And that's what you bypass in a settlement.  Just that if

12  you have a class settlement, you do not have to have the

13  individual inquiries.  You don't have to individually decide

14  the cases.  People can decide whether or not $50 is a fair

15  compromise and participate in the settlement, or if not, they

16  can choose to opt out.

17       And I think that given the roadblocks towards a successful

18  class-wide adjudication, the $50 -- at least the opportunity to

19  participate at $50 or $100 is a fair compromise for the class

20  and for those borrowers who don't believe it's a fair

21  compromise, Rule 23(b)(3) gives them an opportunity to opt out.

22            **THE COURT:**  Perhaps I'm being more professorial than

23  judicial as I'm thinking about this.  It just seems to me

24  counterintuitive that the very argument that I get on class

25  actions, which are under attack these days, as you know, is

1    that you get class action counsel who say:  It saves you having

2    to file each case individually and ultimately it's more

3    efficient.  So intuitively I sort of recoil to something

4    saying:  Well, you can opt-out and file your own suit.

5         Reconcile that for me.

6              **MR. PERMUT:**  I think it does -- it, obviously, does

7    save the Court and the parties the time of adjudication in

8    raising -- in actually litigating the individual issues.

9    There's no question about that.

10        The opt-out is for people who believe they have damages or

11   outliers in the class who want to participate individually in a

12   litigation.

13        I don't think that -- I guess I don't see the

14   inconsistency there.  If you look at the class list here, and

15   we sent out 8 million notices, we had about approximately 400

16   people who wanted to pursue their claims individually and they

17   had the opportunity to do so.  So I think most of the class, at

18   least from the evidence, believed that it was more efficient to

19   participate in the settlement and not to pursue their own

20   claims.

21        The more you have to individually look at the facts of

22   underlying claims, then the less efficient the class action

23   process becomes.  And so there are always trade-offs with

24   regard to a class action settlement.

25        And the opt-out -- I'm not advocating that people should

1  always opt-out, but the opt-out provides that constitutional

2  protection to those people who don't believe that the

3  settlement adequately protects their interests.

4          THE COURT:  Okay.  Thank you, counsel.

5          MRL PERMUT:  Thank you.

6          THE COURT:  Okay.  I see two people in the courtroom

7  and if either of you are here to object to this settlement,

8  would you come forward and state your objection?

9      Come up to the mic here, sir.  State your name and then

10 your objection.

11         OBJECTOR GURNEY:  All right, your Honor.  It's Robert

12 D. Gurney, G-u-r-n-e-y.

13         THE COURT:  Okay.

14         OBJECTOR GURNEY:  I used to be a Bank of America --

15 you know, the beginner one, $1,600 credit limit -- credit

16 cardholder up until some unfortunate circumstances in my life.

17         THE COURT:  And what date was that?  Up until what

18 date?

19         OBJECTOR GURNEY:  I don't know.  The problem is, I

20 went to look back at some of this information and even Bank of

21 America was having a hard time coming up with my Visa

22 statements because I no longer have access to the online

23 system.  I think we're looking at somewhere probably in the

24 summer of '07.

25         THE COURT:  Okay.

1          **OBJECTOR GURNEY:**  My card was eventually cancelled by

2   Bank of America I believe in, I'm going to say late spring.  It

3   might have been summer of '08.

4       During that year, unfortunately, I was employed,

5   unemployed a number of different times.  I had lost my major

6   source of income and at that stage -- do you mind me just -- is

7   it okay?

8          **THE COURT:**  Hmm-hmm.

9          **OBJECTOR GURNEY:**  At that stage I called Bank of

10  America on the phone assuming that I was going to have no

11  problem with their credit protection service working.  I mean,

12  I've had insurance on cars before, you know.  I'm a single

13  male, so there isn't really too many issues that I have to deal

14  with, but I thought it would be appropriate to have insurance

15  coverage in case something happened.

16      The problem that I had with Bank of America made me feel

17  like that I wasn't dealing with Bank of America; that I was

18  dealing with a -- some kind of mob ghetto underwriter.  They

19  must have hung up the phone on me three or four different

20  times.  It took me two months of faxing documents back to them,

21  of them telling me that I didn't have the protection that I

22  thought that I had.

23      I started addressing, unfortunately, the issue of debt

24  cancellation with them because it looked at that time that my

25  unemployment may last longer than I thought it had.  I actually

1  wound up going back to work -- and I will get back to the

2  unemployment in a second -- for three months.

3      So what happened was that they actually made a single

4  payment.  After they made the single payment, they stopped

5  making the payments.  I was able to actually --

6          **THE COURT:**  How much was the single payment?

7          **OBJECTOR GURNEY:**  I don't know.  It wasn't the only

8  credit card that I had.  I think it was anywhere from $35 to

9  $50 a month.  So it's not that hard to... Even if you don't

10 have a job, you know, you're working, like, temporary jobs and

11 all these other things, so it's not too tough to cover.

12     Well, I tried again to try to get them to do something

13 about it, because the second job I went back to ended.  It was

14 a second temporary job down in L.A.  By that time pretty much

15 any type of negotiation about the product had ended.

16     I was able to keep the payments up and then I finally

17 said:  I'm no longer working, period.  I can't keep these

18 payments up and I don't understand why this protection didn't

19 work.

20     When my account was up for renewal -- though, the account

21 was still current.  See, that's the kind of thing that kind of

22 got them.  Got me too.  Was that I just assumed, or maybe it

23 was the wrong assumption, I don't know, like when you get in a

24 car accident, you get hit, the insurance company pays for it.

25 That's what I thought my insurance was.  After spending those

1   two months with them on the phone, it made me realize that

2   something about that wasn't right.

3         Well, I stopped bothering with them.  My card came up for

4   renewal a couple months later and the excuse came out that your

5   current circumstances, credit line -- so it wasn't the only

6   credit card that I had with them, because I started having

7   problems with my other credit cards, too.  This isn't the only

8   credit protection case that I've actually looked at.  And by

9   that time they cancelled the card and that was it.

10        Anyway, what brings me here I have an outstanding balance

11  of $3,300 to a credit collection agency that Bank of America

12  wrote my account off and sent them out to.  I was going

13  through, I think it was Document 62 on, you know, the Pacer --

14  as a non-legal professional, this is actually been kind of an

15  interesting experience because this is the first time I have

16  had a chance to, like, see how these things work.  And,

17  admittedly, my standing right here this is the cheapest way for

18  me to address someone in this kind of an environment by raising

19  an objection.

20        At the time that all this was happening I didn't even have

21  the money nor the time -- you're not thinking of all these

22  things when your life is collapsing -- to take Bank of America

23  to small claims court or whatever court maybe I should have

24  been in to deal with this issue.  Anyway --

25             **THE COURT:**  You heard counsel give me their

1  explanation of how they went about settling this case.

2           **OBJECTOR GURNEY:**  Yeah.  They didn't talk to me.

3           **THE COURT:**  What about that harms you?

4           **OBJECTOR GURNEY:**  Yeah.  The thing that I looked at

5  was Document 62, with some of the named class members.  And I

6  actually even found a Supreme Court precedent that said a

7  non-named member has a right to at least make an objection.

8           **THE COURT:**  You have an absolute right.

9           **OBJECTOR GURNEY:**  Yeah.  That's why I'm standing

10 here.

11      Two of the defendants had very similar circumstances to

12 me.  And as named defendants, I notice -- I think they are

13 getting more money.

14      The thing that I chuckle at is when they first showed the

15 attorney fees on the back in Thanksgiving, is that the

16 attorneys are getting a third of this claim.  And listening to

17 what the plaintiff's counsel speaking to you earlier, she said

18 that only three percent of the 20 million set aside -- if I

19 heard that wrong, then I'm wrong.  There seems to be an

20 available amount of money that is still available for people

21 who maybe had longer-term problems.

22      This brings me to the next issue of Thank God for

23 President Obama, because I got unemployment checks for

24 two-and-a-half to almost three years --

25           **THE COURT:**  Let's not wander too far.

1          **OBJECTOR GURNEY:**  Yeah.  Let's not wander too far.

2     When she addressed the issue of people only being on the

3  system for one payment or for being on the system for, like,

4  months at a time, like, three to six months, unfortunately, I

5  was in a circumstance where I probably would have run the

6  estimate up to that three-year time period.  I just didn't have

7  an adequate income to do anything but basically survive.

8     I'm better off now.  I finally actually even have the time

9  to deal with this.  I wasn't going to, but then they sent me

10  the card that admitted that there was something that was wrong

11  with the whole process.  And I said, wow, I wasn't the only

12  person that went through what Bank of America went through.

13     The reason why I was also talking about the time frame is

14  that, unfortunately, in my circumstances there might have been

15  an issue of debt cancellation.  The amount of money that she's

16  talking about I kind of I started laughing at.  Sorry about

17  that.  I think I even attached it to the objection that I made.

18  I think what I'm suggesting is that the product that was given

19  to me, okay --

20          **THE COURT:**  The what?

21          **OBJECTOR GURNEY:**  The product that I believe was sold

22  to me --

23          **THE COURT:**  Which was what?

24          **OBJECTOR GURNEY:**  Which was the Bank of America

25  Credit Protection did not work the way that they sold it to me.

1          THE COURT:  And it didn't work in what way that

2   harmed you in what amount?

3          OBJECTOR GURNEY:  Basically, I had three years of

4   payments that I should have owed to them and I have an

5   outstanding bill to them for that amount of time. I sat down

6   and did the -- it's funny.  From the time that the card went

7   bad to about right now to the payments that I would have made,

8   it almost comes out about to the amount that's owed right now,

9   too.  I don't know if it's in pennies.  You know, I was kind of

10  doing it, in fact, on the train down here trying to figure out

11  what it was.

12        The bottom line is, the thing didn't work.  You can't

13  believe how I felt when I got that little card in the mail

14  because, you know, when you're like this little guy and you

15  don't know what's going on and you're just like...

16        You know, the original balance was, like, a starter card,

17  too.  Then all of a sudden for the whole thing to fall apart,

18  you know...

19        Bank of America, you know how -- the reputation that these

20  people have, right?  It's very good.  And all of a sudden I

21  feel like I'm dealing with this organization that -- I don't

22  know if I used the word "mob" correctly the last time.  It was

23  almost like they totally --

24          THE COURT:  A wise old --

25          OBJECTOR GURNEY:  I have to get out of here, yeah.

1          **THE COURT:** A wise old judge gave me this 32 years

2 ago. It's a sand time. It has two minutes and fifty seconds

3 in it. You can talk until that runs out.

4          **OBJECTOR GURNEY:** Anyway, I bought the product. I

5 don't believe the product worked. And I don't think that --

6 the adequacy of the product. I know when you're dealing with

7 something that, you know -- credit protection, how do you know

8 when the protection is going to end?

9      So the bank has to make some decisions, like insurance.

10 You know, you buy insurance, you buy insurance, and one of

11 these hundred cards. So you've got a big pay out and the rest

12 of the insurance covers those cards, right? So there's an

13 exact amount. So they have to make some kind of decision as to

14 how long and how much they are going to pay out. I recognize

15 that.

16     And if I'm the only person of the however millions of

17 people who had to go through this ordeal, then maybe I'm that

18 one -- I know there was another objector and she didn't show

19 up here -- that has a legitimate, which I believe I have or I

20 wouldn't be sitting here taking your time.

21     Question about the amount. And that's -- now, when they

22 talk about -- 30 seconds here?

23     When they talk about that Rule 23.1. Recognize, if you

24 would, my circumstances. I don't know if this matters or not,

25 but I was down in L.A. I was trying to break into the film

1  industry.  I had one -- one or two credit cards.  I was living

2  day to day.  You know, when you're getting residual checks, and

3  you're not getting them, and the card payments and all that.

4  So, you know, you're living kind of loosely.

5      I don't have the ability, I don't think -- which is,

6  again, I told you this is the cheapest way to get in front of a

7  judge about this was because of the ability to object in the

8  Supreme Court.  The ability to follow through, on a 23.1.  And

9  I think Bank of America is as much at fault as the amount,

10  because they are afraid that they're going to wind up having to

11  spend more time and money on additional pay out.

12      Sorry.  JFK, huh?  I saw Clinton once.  I'm waiting to see

13  Obama.

14      I'm sorry.  That's probably why I didn't make it in L.A.

15  I talk so much.  That's it.

16          **THE COURT:**  Thank you.  Nice to meet you.

17      Okay.  Thank you all for your presentations, all of which

18  have been helpful.  I have considered the objection and I've

19  careful reviewed the proposed settlement agreement and while

20  there are things that I could wish for or ways I could do this

21  differently were I plaintiff's counsel, I think that's not the

22  measure or the standard.  And I agree with plaintiff's counsel

23  that there are cases that fully support the process that we've

24  undergone here.

25      I find this settlement to be fair and reasonable and

1  adequate.  It appears to be the result of arm's length

2  negotiation and not the product of fraud or overreaching or

3  collusion among the parties.  The agreement treats the class

4  members fairly and I find that it comports with the

5  requirements of Rule 23 of the Federal Rules of Civil

6  Procedure.

7       Additionally, I've made my own review and have considered

8  relevant objections and I find that plaintiff's request for

9  attorney's fees and costs, as well as their request for

10 incentive awards for the named plaintiffs, are fair and

11 reasonable.

12      Accordingly, I'm going to grant both of plaintiff's

13 motions.  I will sign the proposed orders with some very minor

14 modifications that I will make and I'll have my clerk post

15 those once the orders have been filed, counsel.

16      I will close the case with the understanding that pursuant

17 to the settlement agreement itself, I'll retain jurisdiction to

18 enforce the settlement should the need arise.

19      Having said that, is there anything else that we need to

20 discuss or put on the record today?

21      Counsel?

22          **MR. PERMUT:**  Yes, your Honor.  Thank you very much.

23      I appreciate the time and effort that you've put into this

24 case from the very beginning.  It's been a pleasure being

25 before you.

```
 1        I just wanted to -- I meant to do this earlier.  There was
 2   one issue with regards to the final order, or at least our
 3   proposed order.  We had a slight modification that we wanted to
 4   hand up to you and, obviously, any modification that you have
 5   on top of that is fine.
 6        We had -- in the process of going through the settlement
 7   and administering it, we discovered that there were roughly
 8   4,000 cardholders who were part of a portfolio who was sold to
 9   another credit card company and that sale is going to be
10   effective March of this year.
11             THE COURT:  Hmm-hmm.
12             MR. PERMUT:  I spoke to plaintiff's counsel and we
13   talked about how to address that with respect to, in
14   particular, the free period of the product that we had promised
15   to the class members.  And what we agreed to is that those
16   4,000 customers are getting their free service this month and
17   in February in light of the fact that that sale was going to go
18   through in March.  The rest of the class will get their two
19   free months after the final approval, the effective date of the
20   final approval.
21        But we wanted to bring that to the Court's attention, and
22   we have dropped a footnote into the proposed final approval
23   order just to let you know that that occurred.
24             THE COURT:  Okay.  And that is with us?  You have
25   that?
```

1           **MR. PERMUT:**  We have it.  Kathryn has it.

2           **THE CLERK:**  Have you emailed a copy of that to the

3    proposed order box?

4           **MR. PERMUT:**  No, but we can.  We're more than happy

5    to do that.

6           **THE CLERK:**  That would be great, so that we can write

7    modifications to it if we need to.

8           **MR. PERMUT:**  The language is in the footnote on the

9    third page.  I just wanted to alert you to that.

10          **THE COURT:**  Thank you very much, counsel.

11      Do you have something additional?

12          **MS. GEMAN:**  Yes, your Honor.  I join in thanking your

13   Honor, the Court for the time on the case.

14      We had submitted the opt-out list first on November 28th

15   and then the revised opt-out list.  We, in the course of

16   processing, discovered a few more opt-outs.  One person had

17   sworn via affidavit that it had been submitted and we are --

18   the parties have agreed to honor the opt-out, and then a couple

19   other opt-outs had been in a claims box.  So in order to make

20   sure, we have honored the opt-outs we have a revised opt-out

21   list that adds four names.

22      So, would your -- you know, we will submit that through

23   ECF to the Court, unless you prefer that we handle it

24   otherwise.

25          **THE COURT:**  No.  Why don't you submit that?  When

```
 1  will you do that, counsel?
 2             MS. GEMAN:  We can do that today, if your Honor
 3  wishes.
 4             THE COURT:  Would you?
 5             MS. GEMAN:  Yes.  Yes, your Honor.  Thank you.
 6             THE COURT:  Okay.  Thank you, counsel.  Court is
 7  adjourned.
 8             (Proceedings adjourned.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

### CERTIFICATE OF REPORTER

 

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, February 13, 2013